## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| LOU ANN MADDOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 1:09-cv-02212-JHE |
| | ) | |
| GRIMMER REALTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Lou Ann Maddox ("Maddox") brings this action against Defendants Grimmer Realty, Grimmer Realty Co., Inc., GRC Management LLC ("GRC Management"), and Quintard Mall, Ltd. ("Quintard Mall") (collectively "Defendants") alleging a racially hostile work environment, race and gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§1981"). (Doc. 47, Second Amended Complaint). Defendants seek summary judgment. (Doc. 68). The motion is fully briefed and ripe for review. (Docs. 68, 72, 78). For the reasons stated more fully below, Defendants' motion for summary judgment, (doc. 68), is **GRANTED IN PART AND DENIED IN PART**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 55).

after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Factual Background

GRC Management[2] employed Lou Ann Maddox ("Maddox") twice: for a period of time in 2002 and from September 5, 2007 to January 23, 2009.  (Docs. 69-3 at 20, 69-4 at 8, 13, & 69-5 at 18).[3]  All of Maddox's allegations relate to her second employment.

On October 30, 2009, Maddox sued Grimmer Realty, a non-existent entity,[4] alleging she was subjected to a racially hostile work environment, race discrimination based on her Native-American race and dating relationship with an African-American man, gender discrimination, and retaliation.  (Doc. 1).  On July 9, 2012, Maddox added GRC Management, Quintard Mall, and Grimmer Realty Co., Inc. as defendants and removed Grimmer Realty as a defendant, (doc. 34), but added Grimmer Realty back on March 25, 2013, (doc. 47).

Quintard Mall and Grimmer Realty Co., Inc. have never had any employees.  (Docs. 69-7 at 3; 69-8 at 3; & 69-9 at 4 (6:11-7:5)).  Maddox was employed and paid by GRC Management. (Doc. 69-9 at 4 (7:6-9)). GRC Management had more than fifty employees in 2007, 2008, 2009, 2011, and 2012.  (Doc. 69-6 at 17).  Park Grimmer, along with his sister, Susan Grimmer, own GRC Management.  (Doc. 69-9 at 4 (8:22-9:19)).  Park Grimmer's email signature identifies him as the president of "Grimmer Realty Co, Inc."  (Doc. 73-1 at 2).

---

[2] Maddox contends she was jointly employed by GRC Management and her place of employment, Quintard Mall.  (Doc. 72 at 11, ¶1).  The evidence Maddox cites does not support this assertion.  (*See id.* & 69-9 at 4 (7:3-5)).

[3] All citations to the record are to document and page numbers as assigned by the Court's electronic filing system (CM-ECF), except for citations to depositions, which refer to both the CM-ECF page number *and* the deposition page and line numbers.  Internal page numbers have been disregarded with the exception of page numbers for deposition transcripts.

[4] Although Maddox "disputes" Grimmer Realty is a non-existent entity, (doc. 72 at 6), her arguments and evidence do not support this contention.  Defendants responded to the complaint addressed to Grimmer Realty, but did so explaining it was "Grimmer Realty Co., Inc. . . . incorrectly identified as 'Grimmer Realty.'"  (Doc. 4 at 1).

**Maddox's 2007 to 2009 Employment with GRC Management**

Maddox became re-employed by GRC Management in September 2007, in the security department and reported to Dave Sailors ("Sailors"), the Operations Manager at the time.  (Docs. 69-1 at 25-27 (95:12-101:2, 69-4, & 69-13)).   Upon beginning each employment, Maddox was provided an opportunity to review the mall's Equal Opportunity and Anti-Harassment Policy, once in 2002 and once in 2007.  (Docs. 69-3 at 20-13, 69-4 at 14-22, & 69-9 at 35 (131:18-19, 132:11-16)).

Amy Stone ("Stone"), a white female, became General Manager ("GM") of Quintard Mall in March 2008 and was GM during all relevant times.  (Doc. 69-9 at 5 (10:18-11:10)). Stone reported to Park Grimmer.  (*Id.* at 4 (9:20-21)).   In approximately June 2008, Glenn Allgood ("Allgood"), a white male, became Operations Manager and "second-in-command" under Stone when Sailors retired.  (Docs.69-14 at 6 (16:7-12), 23 (84:6-23) & 69-15 at ¶3).  As operations manager, Allgood supervised approximately thirty employees and exercised the power to hire and fire, discipline, and award raises.  (Doc. 69-14 at 7 (20:3-16)).  Allgood was responsible for managing the maintenance and housekeeping departments.  (Doc. 69-9 at 6 at 12-20).

Maddox worked in security until approximately February or March 2008 when she was offered a raise and agreed to move to maintenance, coming under the supervision of Allgood and Maintenance Supervisor Bridgett Ford ("Ford"), a white female.  (Doc. 69-1 at 30-31 (116:7-117:15, 119:2-18), 69-5 at 11, 69-14 at 23 (83:9-84:2) & 69-16 at 6 (14:11-15:6)).   Ford was Housekeeping Supervisor before becoming Maintenance Supervisor.  (Doc. 69-16 at 4-5 (8:2-11, 13:3-5)).  Although Maddox initially testified that she did not recall having any complaints about anyone she worked with while she worked in security, (doc. 69-1 at 30 (116:13-19)), and that she

did not have any complaints about Allgood or anyone else when she worked in maintenance, (*id.* at 33-34 (128:22-129:6)), Maddox later testified, (apparently when the question was clarified), that while she worked in security, Sherry Cobb ("Cobb"), her second shift supervisor, called her a "Cherokee squaw" and often used the word "nigger" around her, (*id.* at 30, 40 (114:21-115:5,19-21)). These allegations will be addressed more fully below.

After about a month in maintenance, Maddox was asked to transfer to housekeeping and accepted the position of housekeeping supervisor over the second shift, making more money. (Docs. 69-1 at 31-32 (118:12-119:15, 120:16-121:23) & 69-5 at 12). Maddox worked as second shift housekeeping supervisor, supervising two people, for "about three months" until July 30, 2008, when she was transferred to the floor crew, keeping her same rate of pay and again coming under Allgood and Ford's supervision. (Docs. 69-1 at 33-34, 45, 47 (126:21-127:16, 130:7-13, 173:4-174:3; 182:18-20 & 69-5 at 13).

Maddox testified, when she went to third shift floor crew, Don Van Vleck ("Van Vleck"), a white male and regular maintenance employee, told her she "was being stuck with [her] own kind." (Doc. 69-1 at 47 (183:7-10)). Allgood was present at the time Van Vleck made this comment. (*Id.* (183:21-23)). Because the only person on floor crew at the time was a black male, Maddox testified she didn't understand the comment. (*Id.* (184:16-17)). Defendants offer evidence Allgood and Ford moved Maddox to floor crew because she had experience operating the necessary machinery (a "tenant machine"), and the position opened when another employee was terminated. (Docs. 69-5 at 13, 68-14 at 22-23 (81:15-82:4), 69-16 at 7, 19 (18:12-20:18, 66:17-67:21), ¶ 69-15 at ¶10).[5] Maddox further testifies she asked Allgood why she was being

---

[5] To the extent it is offered to rebut Defendants' contention that Maddox was moved to floor crew because of staffing needs and her prior experience, Van Vleck's "own kind" statement is hearsay for which Maddox offers no exception.

moved, and he said "[b]ecause I told you to."  (Doc. 69-1 at 174:4-10).  She does not recall whether there was a need on the floor crew, but remembered the floor crew employee who ran the tenant machine had been recently terminated and she (Maddox) knew how to run that machine.  (Doc. 69-1 at 45-46 (174:4-18, 179:6-15)).   In December 2008, Maddox's shift changed from 11 p.m. to 7 a.m.  (Doc. 69-17 at 22).  With the exception of asking Allgood why she was being moved to floor crew, (doc. 69-1 at 45 (174:4-8), Maddox never complained about any floor crew shift changes, (doc. 69-17 at 21).

**Allegations of a Hostile Work Environment**

As indicated above, Maddox testified

> [her second-shift supervisor, Cobb,] called me a Cherokee squaw.  She saw me one day smoking some cigarettes and it was Newport cigarettes, and she asked me what was I doing with them nigger cigarettes.  She said that's what they smoke. She called black kids in the mall hearhen [sic].  She often had me zooming on cameras when I was in security on different specific black group of kids, but never white kids.  Now, you know, that – not never, but, you know, not that often, not as often as she did black kids.

(Doc. 69-1 at  40 (155:13-23)).  Maddox told Cobb she "didn't like that kind of language" and told Sailors she didn't like the way Cobb was talking about other races.  (*Id.*at 40-41 (156:18-157:2, 16-18)).

Maddox also testified that, in May or June 2008, Allgood, in Ford's presence, asked her

---

Hearsay evidence may be considered on a motion for summary judgment if the statement could be reduced to an admissible form at trial and the statement would be admissible at trial for some purpose. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  "For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence). *Id.*at 1323-24. To the extent Maddox's testimony regarding what Van Vleck told her about the motivation for her move to floor crew is offered to prove the truth of the matter asserted, it is thus inadmissible and will not be considered in ruling on the motion for summary judgment.  *See e.g., Jernigan v. Dollar General Corp.*, No. 2:11-cv-01448-WMA, 2013 WL 452820, *8 (N.D. Ala. Jan. 31, 2013); *Bridges v. City of Americus*, No. 1:09-cv-56, 2014 WL 1315339, *3 n.1 (M.D. Ga. March 31, 2014).  Maddox offers no argument to the contrary.

what "race [she had] in her besides white." (Doc. 69-1 at 37 (142:3-22)). She further testified Van Vleck "started calling [her] names not long after [she] told [Allgood and Ford] what [her] race was. It was shortly after that he started." (*Id.* at 38 (147:14-148:2)).

In June or early July 2008, when she was still a second shift supervisor, Maddox claims to have had problems with the first shift housekeeping supervisor, Carolyn Gore ("Gore"), a white female.

> After the changeover between when [Sailors] left and [Allgood] took over operations management, [Ford] took over maintenance, there was a lady named Carolyn Gore took over first shift housekeeping. Everything was fine until the changeover. And it was an everyday thing, they were harassing me and picking on me or leaving me notes and just constantly at me about some little petty something that didn't get done the night before. And four nights out of the week there was [sic] only two of us there to clean. That was -- my nerves just starting to get really bad because it was an everyday thing. When I'd come in there would be a note or there would be a message from somebody that was passed down the line to me.

(Doc. 69-1 at 34-35 (132:14-133:8)). She continued:

> When I would get there in the evening time to do my job there would either be a list of things for me to finish that they didn't get done or a list of things that needed to be done before the next morning, and not including – I mean that's including the job that I already had to do, which is wash trays, mop the food court, pick up after everybody, clean the rest rooms, restock the rest rooms every 10 to 15 minutes to make sure they were still clean. All of that. They would also leave me a list of stuff that they were actually supposed to do in the mornings, but just to keep them from having to do it in the mornings they wanted us to do it.
>
> . . . .
>
> And this was on a daily basis.
>
> . . . .
>
> And like I said earlier, four to five nights out of the week there was only me and one other person to do this for the whole mall.

(*Id.* at 35 (135:16-136:16)). At some point in time, Van Vleck told Maddox (in Allgood's presence) that she did not fit in with his kind, which Maddox understood as meaning white

people.  (Doc. 69-2 at 16 (242:12-22)).  Maddox told Ford, Allgood, and Stone about these issues, and they told her they would get her some help, but never did.  (Doc. 69-1 at 35-36 (136:19-137:14)).

Maddox went to Stone "in late June or early July" 2008 and "broke down crying."  (*Id.* at 36 (139:6-20)).  Maddox testified she "went into [Stone's] office and told her [she] need[ed] to talk to her . . . [a]nd tried to explain to her what happened."  (*Id.*; *see also* doc. 69-5 at 23-41).  Stone told Maddox she would deal with the issue.  (*Id.* (139:20-21)).  Maddox testified:

> She went and talked to [Allgood] and [Ford] and [Gore].  And then I was confronted by [] Ford, [] Gore, and [] Allgood in [] Allgood's office, and he [(Allgood)] threatened me that it would be my job if I ever even spoke with [Stone] again.  I wasn't allowed to speak to her, I wasn't allowed to go to her office, I wasn't allowed to even talk to her.

(*Id.* (139:20-140:8)).  Maddox tried to report this incident to Stone, but she wouldn't listen.  (*Id.* at 140:12-20).  The others, presumably Allgood, Ford, and Gore, told Maddox Stone was only over security, and not to deal with her anymore.  (*Id.*).  Because Ford, Gore, and Allgood's offices were on the hall before Stone's office, Maddox believed there was always someone preventing her from reporting these incidents to Stone.  (Doc. 69-2 at 2 (187:11-18)).  They also threatened Maddox's job if she complained to Stone or Park Grimmer.  (Doc. 69-1 at 43-44 (168:19-169:4)).

At one point when Park Grimmer was visiting the mall, he asked Maddox how things were going.  (*Id.* at 44 (169:10-17)).  Maddox testified she wanted to tell him, but Allgood was standing behind Park Grimmer shaking his head "no."  (*Id.*).  According to Maddox, Allgood took his thumb and made a horizontal motion across his throat indicating to Maddox she better not say anything to Park Grimmer.  (*Id.*).

At the end of July/early August 2008, people did not ask Maddox if she was ok when she

returned to work after being out sick, "[w]hen [she] tr[ied] to talk to anyone they ignore[d] [her]," Allgood sent Gore to "buy breakfast for all employees but [her]," and she "wasn't even asked if [she] wanted anything," and Gore and Ford bought everyone else breakfast for two separate occasions but not her.  (Docs. 69-2 at 12 (226:5-20) & 69-5 at 23-41).

Maddox also claims Gore, Ford, Allgood, Van Vleck, and Cobb (discussed above) made comments about her Native-American race.  (Doc. 69-1 at 37 (142:23-243:5)).

Maddox testified that Gore "[a]t different times" called her

> a Cherokee squaw, she called me a savage.  She asked me did I live in a teepee. She asked me if I wanted some monkey grass they had dug up.  She said, I thought you'd like monkey grass.[6]  She asked me what reservation I was from. She asked me if I had any little papooses at home.  She often used the word "nigger" around me and called me a squaw quite often.

(Doc. 69-1 at 37 (143:2-144:8)).  Maddox verbally reported Gore's statements to Allgood and Stone but did not put them in writing.  (*Id.* at 37-38 (146:20-147:13)).

Maddox testified that Ford

> called me a Cherokee savage, an Indian squaw, a Cherokee squaw.  She asked me a lot of times especially if it was raining was my teepee going to flood out.  She asked me to do rain dances for their grass to grow because they had fertilized it. . . .  She asked me had I ever shot anybody with my bow and arrow.  She asked me did I make my own weapons, did I make my own arrows for my bow and arrow.  She was always calling me a squaw.  Her and [Gore] would stand in the break room in the mornings while everybody was eating their breakfast, and I'd be at the time clock, and they would be yawning like they were yawning and they'd take their hand and put it up over their mouth and go (demonstrating) every morning.

(*Id.* at 41 (157:22-158:22)).

Maddox alleges Van Vleck made similar comments:

---

[6] It is not uncommon when mall property is re-landscaped for the "discarded plants" (including monkey grass) to be offered to mall employees for their own gardens and/or yards. (Doc. 69-15 at 7).  For example, Stone has been offered and has taken left over plans and planted them in her own yard.  (*Id.*).

[Van Vleck] called me a Cherokee squaw every time he got around me, a savage. . . . He asked me how to scalp people, asked me had I ever scalped people. . . . He asked me if I lived in a teepee.  Asked me if I carried a bow and arrow for protection.  He asked me what reservation I was from.  He asked me -- there was a truckload of monkey grass outside one day when I came in, and he asked me did I want the monkey grass. . . .  He asked me to do a rain dance for his grass.

(Doc. 69-1 at 38-39 (147:14-148:13, 149:13-14).  Maddox further testified

He called me a nigger lover.  He called me a Cherokee squaw.  He called me a savage.  He asked me to do a rain dance for him.  He asked me if I lived in a teepee.  Did my teepee flood out when it rained.  He asked me -- he's the one that asked me first about the monkey grass.  He asked me if I carried a bow and arrow for protection. . . .  Did I make my own bows and arrows.  He asked me if my children -- how many papooses did I have. . . .  He asked me why I smoke nigger cigarettes because I had Newports in my pocket.  He called me a Cherokee squaw every day I worked with him.

(*Id.* at 42 (162:5-163:6)).

Maddox claims another co-worker, Drenda Rogers, a white female, called her a Cherokee squaw.  (*Id.* at 43 (165:6-166:6)).  Maddox also claims a white male employee named Michael, whose last name she cannot remember, called her a "Cherokee squaw and savage.  And he asked [her] how did Cherokee squaw women fuck."  (*Id.* at 44 (171-13-21)).  Maddox testified she reported this incident to Allgood, who just laughed.  (Doc.69-1 at 44 (171:17-18)).

Maddox testified she "had been dating a black guy [Patrick Ackles] before this time, and they had asked [her] questions about him, too."[7]  (*Id.* at 39 (149:17-19)).

Maddox further testified Allgood

often used the word "nigger" around me when he was referring to black people.  He always made comments about mixed [race] couples that was [sic] walking through the mall or about the mall or around the mall that was there [sic] shopping.  He made the comment to me about me smoking nigger cigarettes too.  It was right before I went to third shift when he made that comment to me because it had a pack of Newport smoking them outside maintenance.

---

[7] For purposes of summary judgment, Defendants do not dispute Maddox's co-workers and supervisors knew she was part-Native American and was dating a black man.  (Doc. 68 at ¶2, n.1 (citing doc. 69-1 at 37 (141:12-142:22)).

(Doc. 69-2 at 16-17 (244:17-245:4)).  According to Maddox, she overheard Allgood

> making several comments to mixed [race] couples that would walk by.  He'd call
> them nigger lovers.  He would make fun of little kids that was [sic] mixed [race]
> and say something about that poor child, look at that poor little bastard, he don't
> realize he's half nigger. . . .  He was present a lot of the times when employees
> would call me that, especially [] [Van Vleck], and he laughed when he said it.
> They said when President Obama got president, I wish somebody would kill that
> black bastard, somebody needs to kill that damn nigger.  We don't need that damn
> nigger for no president.  [] [Van Vleck] says he hopes that he's setting -- that he's
> present when somebody kills that black nigger bastard.  And they always said that
> around me.  It was always comments made around me about black people.

(Doc. 69-1 at 43 (166:9-167:5)).  Although, when asked if she stated everything she recalled,

Maddox testified "I know there are more things, but I don't recall them all right now.  That's just

the basics of it."  (*Id.* (168:4-8)).  In a later submitted affidavit, Maddox stated:

> I heard [] Allgood call me savage, squaw, and Cherokee squaw on a daily basis
> when he worked with me.
>
> [] Allgood asked me if I lived in teepee and if I would do rain dances for the
> mall's grass multiple times throughout my employment.
>
> [] Allgood asked if I carried a bow and arrow for protection or made my own
> weapons on numerous occasions.
>
> Allgood asked me how many papooses I had.
>
> Allgood pointed to a dead bird and told [] Van Vle[c]k go get those feathers,
> [Maddox] may want them for her hair.
>
> [] Allgood asked me if my teepee flooded when it rained, he asked that on the
> days he worked with me and it was raining or had rained the day before.
>
> Allgood asked if I chopped my firewood with my tomahawk, on numerous
> occasions when the weather was cold.

(Doc. 71-20 at 2-3).[8]

---

[8]  Defendants challenge the contents of Maddox's declaration, arguing it should be
stricken under the "sham affidavit doctrine."  (Doc. 78 at 5-6).  This doctrine states: "When a
party has given clear answers to unambiguous questions which negate the existence of any

Sonya McKinney Ramey ("Ramey"), who worked at Quintard Mall from 2007 through 2011 in Security, heard Allgood make jokes about Native Americans, including comments about Maddox scalping people, (doc. 71-19 at ¶3), telling Van Vleck to be careful Maddox would "scalp [his] ass," (*id.* at ¶4), and laughing at moccasins Maddox wore, (*id.* at 8). Ramey also heard Allgood, Gore, and Ford make comments like these while outside smoking a couple times a week. (*Id.* at ¶5).[9]

Maddox testified she told Van Vleck and Gore their comments were offensive and asked them to please stop saying those things to her. (Doc. 69-1 at 38 (148:18-22)). Maddox further

_____

genuine issue of material fact, the party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, the previously given clear testimony." *Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984). Not only do Defendants fail to point out a genuine issue of material fact created by Maddox's declaration, (*see* doc. 78 at 5-6), when comparing Maddox's deposition testimony to her later filed declaration, there is not a clear contradiction justifying application of this doctrine. When determining whether to apply the sham affidavit doctrine,

> a court must distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence[,]" and an affidavit may be disregarded as a sham only " 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"

*Tippens v. Celotex, Corp.*, 805 F.2d 949, 953–54 (11th Cir.1986) (quoting *Van T. Junkins and Assocs.*, 736 F.2d at 657) (alterations in *Tippens*). Here, Maddox did not clearly answer an unambiguous question at her deposition, as a reasonable person in Maddox's position could have interpreted the question regarding whether she stated everything she recalled Allgood saying to only relate to comments regarding African-Americans or her association with African-Americans. Therefore, the possibly inconsistent later filed declaration only creates a question of credibility, which will not be evaluated at summary judgment. *See Tippens*, 805 F.2d at 953. Defendants have not demonstrated the applicability of the sham affidavit doctrine to Maddox's declaration.

[9] Because there is no evidence Maddox was aware of these comments, they could not have contributed to Maddox's subjective or objective view of a hostile work environment, thus they are irrelevant and will not be considered for this purpose. *See Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1522 (11th Cir. 1995). To the extent they are offered for another purpose, such as to demonstrate a discriminatory animus, they will be evaluated accordingly.

testified she reported the comments to Allgood and the others, including Stone "several times, but the last time I had made one and she [Stone] said something to them, my job was threatened. I was told that if I told [] Park [Grimmer] or [] [Stone] anything that was going on with me at the mall I would be fired."  (*Id.* at 43-44 (168:9-169:4)).

Additionally, Maddox contends that, while she was a housekeeping supervisor, she told Allgood that Kathy Wynn ("Wynn"), a black female reporting to her, "had complained about being discriminated against."  (Doc. 69-2 at 14 (233:15-235:6)).  She testified:  I just remembered that [Wynn] felt like she was being discriminated against because she was black. And I asked her why, and she just had a breakdown with me.  So I discussed it with [] [Allgood] and that's all I remember about that conversation was that part."  (*Id.* (234:8-17)).  Maddox does not know whether Allgood relayed this complaint to anyone.  (*Id.* (234:5-20)).  Other than this purported conversation with Maddox, Wynn never complained of discrimination of any kind at GRC Management or Quintard Mall and is still employed at the mall.  (Doc. 69-15 at 3).

Shawn Scott ("Scott"), a white male and GRC Management employee terminated on October 20, 2009,[10] filed an EEOC charge on October 23, 2009.  (Doc. 69-10 at 9, 18).  In his EEOC Charge, Scott explained that during the course of his employment he worked with Maddox, who had filed two Charges of Discrimination with the EEOC.  (*Id.* at 18).  He states that, "in late 2008" he was called into Stone's office to meet with her and Allgood.  (*Id.*).  He further states that, during this conversation Allgood "threatened" him by saying "Grimmer Realty is my livelihood and anyone messing with it or helping someone else mess with it, I'll see you gone.  You didn't think I knew about that."  (*Id.*).  Scott understood Allgood to be referring

---

[10] Scott was warned multiple times about his unprofessional conduct.  (Doc. 69-10 at 10). The "final straw" was when he spoke in a harassing tone and words to co-worker Henry Cottingham, a black male, and his supervisor, David Duckett, a white male.  (*Id.* at 5-14; doc. 69-15 at 6, ¶13).

13

to Maddox and her pending EEOC Charge.  (*Id.*).  Scott also stated that Allgood told him not to

talk to Maddox about management.  (*Id.*).   Maddox had access to phone numbers for Park

Grimmer (beeper and home), Susan Grimmer (home and cell), and Stone (home, office, and

cell), which were posted on the mall break room bulletin board and also in her own handwritten

notes, but she never used any of the phone numbers.  (Doc. 69-1 at 44 (170:3-8); 69-2 at 15

(238:6-240:3); 69-5 at 23-40; & 69-9 at 34 (127:13-129:7)).

### Maddox's November 2008 Incident with Van Vleck

In addition to the comments discussed above, Maddox testified that on one occasion in

November 2008, Van Vleck called her "a stupid Cherokee freak" and hit her in the back with a

water jug.  (Doc. 69-2 at 2-3 (186:4-6, 190:14-191:4)).  Maddox further testified Allgood, Ford,

and Gore prevented her from telling Stone about the incident, although she admits she never tried

to call Stone stating: "I could have I guess, but I had tried before and nothing was done."  (*Id.* at

2 (185:14-188:2)).  Maddox filed a written police report with the Oxford Police Department but

did not swear out a warrant against Van Vleck.  (*Id.* at 2-3 (186:4-191:7)).

Stone found out about this incident sometime in November and requested Allgood meet

with Maddox to find out if someone was bothering her.  (Doc. 69-9 at 8, 17, 23, 28 (24:3-8,

60:11-16, 85:10-17, 104:17-105:13)).  She told Allgood to include Ford and Graham Boozer

("Boozer"), a training supervisor, in any meeting as witnesses.  (Doc. 69-9 at 8 (24:12-18)).

Specifically:

Specifically, regarding Maddox's complaints, on November 3, 2008, Officer Glanze, a

white male, and Kendrick O'Hara ("O'Hara"), a black male, came to see Stone:

> O'Hara stated that some paperwork was at the mall and that he had heard his
> name was brought into it.  He stated that he did not want to be part of any claim
> and that the mall and [] Stone had always treated him well.  [] Stone told []
> O'Hara to feel free to come to her with any problems or if he was being

> mistreated in any way or if he witnessed anyone being mistreated.  He said that he
> would.  Officer [] Glanze stated that he and [] O'Hara had been approached to be
> part of the lawsuit.  He stated that he had no reason to believe any of the things
> that were being said, but wanted [] Stone to be aware of what was being said.

(Doc. 69-17 at 7-8).  Officer Glanze and O'Hara made Stone aware that Maddox had "paperwork

in the break room, asking other folks to get involved."  (Doc. 69-9 at 37 (139:14-19)).  It was at

or around this time Officer Glanze told Stone he had heard Maddox was going to swear out a

warrant against another employee and she asked Allgood to meet with Maddox (discussed

above).  Specifically,

> around November 3, 2008, Officer [Scott] Glanze told [] Stone that another
> officer told him [Maddox] was going to swear out a warrant for another mall
> employee for harassment.  Officer Glanze stated that if the warrant was sworn
> out, then the employee would be taken into custody from the mall.  [] Stone asked
> that if the warrant was sworn out, that she be contacted and she would work with
> the police department to ensure the employee was available.

(Doc. 69-17 at 8; *see* doc. 69-9 at 28, 38 (104:17-105:13, 143:21-144:3)).

Stone testified that, when Officer Glanze and O'Hara came to her, "[t]hat's how [she]

initially realized that [they] needed to look into that further, to make sure one of [their]

employees was not being harassed, discriminated against, bothered . . . ."  (Doc 69-9 at 38

(145:15-21)).  Stone talked to Park Grimmer about what appeared to be Maddox inquiring with

others about a discrimination lawsuit, but Park Grimmer told Stone there was nothing they could

do about that.  (Doc. 69-9 at 24-25 (89:21-90:6)).

Maddox testified that either the day after the incident "or a couple of days later []

Allgood called [her] into his office and asked [her if she] ha[d] any problems with anybody.

[She] told him, [she] did, but [she] took care of it.  And that's all [she] said to him and [she

walked off."  (Docs. 69-2 at 3 (192:13-20) & 69-5 at 15-17).  Allgood told Maddox to come see

him if she had any problems and she said she would.  (Docs. 69-2 at 4 (194:14-195:8) & 69-5 at

15-17).  Ford and Boozer were also present at this meeting.  (Docs. 69-5 at 15-17 & 69-16 at 8

(22:18-23:8)).

> Ford's notes on the meeting state:
>
> [Allgood] asked [Maddox] how she was doing.  He then asked her if anyone was
> bothering her.  She told [Allgood] no that know [sic] one was bother her and that
> she was just tired and ready to go home and go to bed.  He said are you sure know
> [sic] one has been bothering you or has said anything to you out of the way.  She
> said yes I'm sure.  He said if anyone ever says or does anything to you, you come
> and see me we will take care of it.  She said ok I will.  She said is that all,
> [Allgood] said yes and she got up and left.

(Doc. 69-5 at 17).

Maddox does not dispute this is an accurate reflection of the meeting, but clarified her

response when she further testified she didn't "have problems anymore, [she] took care of it

[her]self," (doc. 69-2 at 4 (195:22-23)), and explained "[b]ecause I had tried to tell [] Allgood

what was going on before I went to the police department, and he wouldn't listen to me.  He just

refused to listen to me." (*Id.* at (196:4-7)).

Maddox filed an EEOC charge against "Grimmer Realty" on December 29, 2008, and

supplemented her charge on January 30, 2009, after she was terminated on January 23, 2009.

(Docs. 69-5 at 41 & 69-19 at 2).   Defendants' stated reason for terminating Maddox's

employment is that she's threatened to blow up the mall.  (Doc. 69-19 at 2).  Maddox denies

making this threat.  (*Id.*).

### Maddox's Purported Threat to Blow up the Mall on January 17, 2009, and Subsequent Termination on January 23, 2009

Maddox worked on Saturday, January 17, 2009, and Sunday, January 18, 2009, and was

off Monday through Thursday, January 19-22, 2009, of the following week.  (Docs. 69-9 at 21

(76:4-10) & 69-20 at 2).  On Tuesday, January 20, 2009,[11] Allgood told Stone "that two other employees had told him that [Maddox] had threatened to blow up the mall."  (Docs. 69-9 at 11-12 (37:15-38:9, 39:1-6) & 69-15 at 4, ¶8).  Stone told Allgood they needed to speak with the two employees independently as soon as possible, and they did.  (Docs. 69-9 at 12 (39:7-23) & 69-15 at 4, ¶8).

Stone and Allgood called the employees, Linda Longwell ("Longwell") and Elizabeth Doss ("Doss"), in separately and asked each to write down what happened.  (Doc. 69-9 at 12 (39:10-40:8)).  Both Longwell and Doss independently confirmed Maddox made a threat against the mall.  (Doc. 69-15 at 4, ¶8).  Longwell wrote: "[Maddox] didn't get her W2 forms and said thretning [sic] remarks tords [sic] the office people and supervisor at the mall.  I can't remember if she said, blow up the mall, shute [sic] people in the mall, or higher [sic] someone to take care of it for her."  (Doc. 69-14 at 61).  Doss wrote that on January 17, 2009, she

> got to work at 5:45 came in and [Maddox] and [Longwell] was [sic] sitting on buckets talking.  [Maddox] was talking about she did not get her W-2 and I said we got ours.  She said they probably won't give her hers.  Then she said she would blow up the mall or whip somebody [sic] ass, if she don't get her W-2.

(Doc. 16-14 at 52)).

At this point, Stone called Park Grimmer to make him aware of what was going on because, according to Stone, it was a safety issue.  (Doc. 69-9 at 12 (40:9-12)).  Stone told Park Grimmer what Allgood had reported and what Longwell and Doss said when called in individually.  (*Id.*at 12-13 (40:13-42:8)).  Stone let Park Grimmer know they were going to terminate Maddox and ban her from the mall.  (*Id.*).  Stone testified:

> Because at that point, [Maddox] was a huge threat to, not only our employees, not only my family, everyone else's family, shoppers, and not only -- in my mind at that point, not only did she make a threat, she had the means to do it. . . .

---

[11] Monday, January 19, 2009, was a federal holiday, Martin Luther King, Jr. Day.

> She knew where every chemical in the mall was. . . .  Cleaning, cleaning chemicals that are flammable.  So she knew where all the areas were to get those solvents, chemicals, whatever you want to call them, solutions that were flammable.  So she didn't have to think in her mind and plan to blow up the mall.  All she had to do was go and do it at that point.

(*Id.*).[12]

Maddox agrees she would "consider it serious if someone threatened to do harm to the mall or anybody at the mall," (doc. 69-2 at 7 (207:11-14)), and the Quintard Mall Company Rules and Regulations, updated July 19, 2008, explicitly state threatening conduct is a terminable offense, (doc. 69-4 at 9).  Despite two employees independently confirming otherwise, Maddox denied threatening to blow up the mall.  (Doc. 69-9 at 13 (44:9-14)).

Stone and Allgood met with and terminated Maddox on January 23, 2009, when she returned to work, and informed her she was banned from mall property.  (Doc. 69-5 at 18 & 69-14 at 59).  They told Maddox she was being terminated for making threats against the mall or people in the mall.  (Doc. 69-2 at 7 (205:9-20, 207:15-208:4)).  Maddox's termination paperwork stated the reason for her discharge as "threats on mall" and stated "two employees overheard [Maddox] make threats of damaging mall property.  Both employees were called in separately [sic] to verify threat."  (Doc. 69-5 at 18).  Stone also sent Maddox a letter regarding her ban from the mall, which stated, *inter alia*, "[o]n January 17, 2009 you were overheard making threats that would result in the harm of mall property as well as mall patrons and employees.  This action was brought to mall management's attention and verified with more than one person."  (Doc. 69-5 at 19).   Stone, Allgood, and Park Grimmer all participated in the decision to terminate

---

[12] Maddox disputes this testimony, but her only basis for the dispute is that "the quoted testimony lacks foundation as to whether there were actually chemicals in the mall that could be used for such purposes."  (Doc. 72 at 10).  Maddox does not dispute and offers no evidence to contradict that this was Stone's sincerely held belief.

Maddox.  (Doc. 69-9 at 11 (37:9-14)).

A previous employee, Shamieka (or Shemieka) Patterson,[13] a black female, had also been terminated for making threats against people at the mall and specifically threatening to kill her supervisor, Ford.  (Doc. 69-9 at 13-14).  Other employees have also been terminated for threatening the safety of mall patrons and/or employees, including several white males.  (Doc. 69-15 at 5-6).  Likewise, other employees, white and non-white, male and female, have been banned from the mall and/or will otherwise be asked to leave if they return to the mall.  (Docs. 69-9 at 40 (152:11-153:14) & 69-17 at 20-21).

Stone and Allgood selected Tim Sneed, a white male, to perform Maddox's duties after her termination.  (Docs. 47 at 5, ¶30 & 69-2 at 10-11 (219:23-221:1)).  Sneed worked at the mall at the same time as Maddox and knew how to run the tenant machine.  (*Id.* at 10 at (220:5-13)).  The next person hired after Maddox's termination was a white male, David Brown.  (Doc. 69-9 at 23 (82:6-8)).

### Maddox's Unemployment Compensation Claim and the Department of Labor's Determination that Maddox was Fired for Threatening to Blow up the Mall

Maddox filed for unemployment compensation benefits against GRC Management with the Alabama Department of Labor ("AL DOL") (formerly the Alabama Department of Industrial Relations), but the AL DOL denied her claim after a telephonic hearing in which Maddox was represented by counsel.  (Docs. 69-2 at 9 (216:2-22) & 69-5 at 21-22).  The AL DOL determined Maddox was "discharged or removed from work . . . for threatening to blow up the Quintard Mall . . . ."  (Doc. 69-22 at 2).  It concluded "[t]he preponderance of the evidence in this case shows that [Maddox] was discharged for making a threat to blow up the mall where she was

---

[13] The evidence regarding what Patterson heard from Ford, (*see* doc. 72 at 35), is not relevant to Maddox's subjective or objective beliefs regarding a hostile work environment and is otherwise hearsay.  Maddox offers no argument to the contrary.

employed.  This would be considered a threat to endanger the safety of others."  (Doc. 69-22 at 2).  This action followed.

### III. Analysis

Maddox initially asserted claims under Title VII and § 1981[14] for a racially hostile work environment, racial discrimination, gender discrimination, and retaliation.  (Docs. 1 & 47).  Maddox has abandoned her gender discrimination claim, (doc. 72), and Defendants' motion for summary judgment will be **GRANTED** as to this claim.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  As to Maddox's remaining claims, she specifically asserts a hostile work environment claim based on her Native American ancestry and association with a black man, a race (Native-American) and association (with a black man) discrimination claim based on her termination, and a retaliation claim based on her termination.  (*See* doc. 72).  Because both Title VII and § 1981 have the same requirements of proof and use the same analytical framework, *see Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), the court will expressly address the Title VII claims with the understanding the analysis

---

[14] Despite Defendants' arguments to the contrary, Maddox's § 1981 claims are not barred by collateral estoppel (nor is she barred from arguing pretext).  In this context, the application of collateral estoppel depends on whether the claims and related issues were fully litigated and decided in the state judicial proceeding.  *See Carlisle v. Phenix City Bd. of Educ.*, 849 F.2d 1376, 1379-80 (11th Cir. 1988).  If claims were not decided in the course of the state action, there can be no collateral estoppel.  *Id.* (citations omitted).  Defendants attempt to assert collateral estoppel on the basis of the AL DOL's unemployment benefits determination where the issue of disparate treatment and retaliation were irrelevant to the outcome, and there was no discussion of racial animus or Maddox's previous complaints.  (*See* docs. 69-5 at 21 & 71-15).  Because the unemployment claims are dependent upon issues other than race discrimination and retaliation, the ADIR decision does not work to preclude Maddox's claims in this action.  *See, e.g., Rawlinson v. Whitney Nat'l Bank*, 416 F. Supp. 2d 1263, 1273-74 (M.D. Ala. 2005).  Specifically, without any discussion of race or retaliation, what the AL DOL decided was that there was a legitimate, nondiscriminatory reason for Maddox's termination, thus Maddox could be estopped from arguing against this.  *See Carlisle v. Phenix City Bd. of Educ.*, 849 F.2d 1376, 1379-80 (11th Cir. 1988).  However there was no finding as to whether Defendants had any racial animus or retaliatory motive in terminating Maddox.  *See e.g., id.* at 1380.

also applies to the § 1981 claims, unless expressly indicated otherwise.

**A. Proper Defendants**

As an initial matter, Grimmer Realty is a non-existent entity.  There is no evidence otherwise, and Maddox offers no reason it is subject to suit.  Accordingly, all claims against Grimmer Realty will be **DISMISSED**.

Defendants next argue Grimmer Realty Co., Inc. and Quintard Mall are not subject to suit under Title VII because they do not have "employees."  (Doc. 68 at 27); *see* 42 U.S.C. § 2000e(b).  They further argue Grimmer Realty Co., Inc. and Quintard Mall are not subject to suit under § 1981 because Maddox did not have a contractual relationship with these entities.  (*Id.*); *see Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006) ("[A] plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'").

Although Grimmer Realty Co., Inc. and Quintard Mall do not have employees and did not contract directly with Maddox, they may be considered Maddox's employer and subject to suit under Title VII and § 1981 under an "integrated enterprise" theory.  *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) ("We accord a liberal construction to the term 'employer' under Title VII."); *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 932-33 (11th Cir. 1987); *Hegre v. Alberto-Culver USA, Inc.*, 508 F. Supp. 2d 1320, 1333 (S.D. Ga. 2007) (applying this theory to a § 1981 claim).  Under this theory, courts consider several factors to determine if two or more business entities should be treated as a single or joint employer.  *Id.* at 933.  These factors include: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.  *Id.*

21

While it would be premature based on the record to conclude that Grimmer Realty Co., Inc., Quintard Mall, and GRC Management are "a single employer," the evidence clearly raises a genuine issue of material fact.  Defendants appear to have interrelated operations in managing the Quintard Mall, centralized control over labor relations out of their common home office in Birmingham, Alabama, and common management and ownership.  Park Grimmer, partial owner of GRC Management is also president of Grimmer Realty Co., Inc.  Park Grimmer was also involved in the management of Quintard Mall, as Stone, the mall's general manager, reported to Park Grimmer.  Additionally, many of the documents Maddox received appear to be provided by Quintard Mall, (*see e.g.*, doc. 69-4), although it was not her employer.  Accordingly, summary judgment on this ground is inappropriate.

Defendants also argue Maddox cannot assert a Title VII claim against GRC Management or Quintard Mall because she did not name them in her EEOC Charge. (Doc. 68 at 27; *see* doc. 69-19).  Ordinarily a party not named in an EEOC charge cannot be sued in a subsequent civil action.  *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1358 (11th Cir. 1994).  This requirement serves to notify the charged party of the allegations and allows the party an opportunity to participate in the conciliation and voluntarily comply with the requirements of Title VII.  *Id.*  Courts, however, liberally construe this requirement.  *Id.*  Where the purposes of Title VII are fulfilled, an unnamed party in the EEOC charge may be subject to the jurisdiction of the federal court.  *Id.*

To determine whether the purposes of Title VII are met, courts do not apply a rigid test but instead look to several factors including: (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received

adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings. *Virgo*, 30 F.3d at 1359. Defendants do not address any of these factors. Maddox, however, argues these factors weigh in favor of allowing this action to proceed against GRC Management and Quintard Mall. (Doc. 72 at 38-40). Reviewing the available evidence, the notice and conciliation purposes of Title VII are satisfied. Although Maddox knew (or could have easily ascertained) the identity of these entities when she filed her EEOC charge naming "Grimmer Realty,"[15] (docs. 71-5 & 71-17), the remaining factors weigh heavily toward allowing this action to proceed against the other defendants. Because of the interrelation of operations, common management, and common home office (discussed more fully above), GRC Management and Quintard Mall have a similar interest in this matter as Grimmer Realty Co., Inc., received adequate notice of the charges, had an adequate opportunity to participate in the reconciliation process, and will not be prejudiced by their technical exclusion from EEOC proceedings. Summary judgment is not appropriate on this ground.

**B. Hostile Work Environment**

Federal employment laws do not operate as a "general civility code." *Lockett v. Choice Hotels, Int'l, Inc.*, 315 Fed. Appx. 862, 865 (11th Cir. 2009). Instead, only the type of severe and pervasive harassment that "alter[s] the 'conditions' of the victim's employment" is prohibited. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). To establish a hostile work environment claim, Maddox must demonstrate:

(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to

---

[15] Defendants appear to concede the EEOC charge naming "Grimmer Realty" is sufficient to give notice to "Grimmer Realty Co., Inc."

> unwelcome harassment; (3) that the harassment must have been based on a
> protected characteristic of the employee . . . ; (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions of employment
> and create a discriminatorily abusive working environment; and (5) that the
> employer is responsible for such environment under either a theory of vicarious or
> direct liability.

*McCann v. Tillman*, 526 F.38, 1370, 1378 (11th Cir. 2008) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).   Defendants contend Maddox cannot establish elements three and four of this claim.

### 1.  Scope of Claim

Citing Fourth circuit case law, Defendants argue the court should not consider harassment by anyone other than Allgood when evaluating Maddox's hostile work environment claim because he is the only person Maddox mentions in her EEOC charges as subjecting her to harassment.[16]  (*See* doc. 68 at 42).  Before filing a Title VII action, a plaintiff must exhaust her administrative remedies by filing a charge of discrimination with the EEOC. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir. 1970); *see also Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir.2000).  Although a court must liberally construe EEOC charges prepared without the assistance of counsel, a plaintiff's civil complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000)).  The Eleventh Circuit has stated that "[a]s long as allegations in the judicial complaint and proof are 'reasonably related' to charges in the administrative filing and 'no material differences' between them exist, the court will entertain them." *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989).

---

[16] Because there is no agency exhaustion requirement under § 1981, this argument only applies to Maddox's Title VII hostile work environment claim.

"Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEOC complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." *Id.*

In her EEOC Charge, Maddox checked the boxes for discrimination based on race and retaliation and also indicated the discrimination took place on December 18, 2008, and marked the box for "continuing action." (Doc. 71-5 at 2). Maddox also provided a narrative statement, including the specific allegation that Allgood harassed and discriminated against her based on her Native American ancestry and because she was dating an African American. (*Id*). She further noted "management" told her if she complained to (other) management or the owner, she would be fired. (*Id.*). Although Maddox only made specific allegations of harassment against Allgood and generally referred to "management" threatening to fire her if she complained in her EEOC Charge, her current allegations regarding other supervisors and co-workers harassing her based on her Native American ancestry and dating relationship with an African-American man merely serve to amplify her claim and are not offered as the essential basis of the claim. *See Wu*, 863 F.2d at 1547. Furthermore, a reasonable investigation of Maddox's EEOC charge would reveal that Maddox had complained about harassment by people other than Allgood, including going to the police about the November 2008 Van Vleck incident (which was reported to Stone). Defendants' argument based on case law from outside of this Circuit is unpersuasive. Whether the omissions of these allegations from her EEOC charge affects Maddox's credibility is a question for the jury. *See e.g.*, *Sears v. PHP of Alabama, Inc.*, No. 2:05CV304-ID, 2006 WL 932044, \*12 (M.D. Ala. April 10, 2006).

### 2.  Harassment Based on a Protected Characteristic of the Employee

There is no dispute the various comments about Maddox's Native American ancestry are

based on one of Maddox's protected characteristics.   Defendants argue, however, Maddox cannot base her hostile work environment claim on harassing comments about African-Americans, including derogatory comments about interracial-couples, because they are not based on one of Maddox's protected characteristics.   (Doc. 68 at 42-43).   To state an associational hostile work environment claim in this context, a reasonable jury must be able to conclude that the comments were attributable to the plaintiff – that they were about Maddox's interracial relationship.  *See Tomczyk v. Jocks & Jills Rests., LLC*, 198 Fed. Appx. 804, 808-09 (11th Cir. 2006).   Defendants do not dispute Maddox's supervisors and co-workers were aware of her romantic relationship with an African-American man.  (Doc. 68 at ¶2, n.1 (citing doc. 69-1 at 37 (141:12-142:22)).   Therefore, based on the nature of the comments, a reasonable juror could conclude the comments about interracial couples and biracial children directed at Maddox were alluding to her interracial relationship.   However, comments about President Obama and other general comments (such as the use of the word nigger) about African-Americans lack this requisite connection.[17]

### 3.  Severe and Pervasive Harassment

Maddox must also establish "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment."[18]   *Miller*, 277 F.2d at 1275.   "Determining whether the harassment was

---

[17] There is no evidence Maddox's complaints regarding being "picked on" about petty things she did not complete on night shift and not being asked how she was when she returned to work after being sick or if she wanted breakfast are related to a protected characteristic and will not be considered.

[18] Maddox argues she is not required to establish this "severe and pervasive" element, but instead may point to a tangible employment action in support of her claim.  (Doc. 72 at 41-42).  To an extent, Maddox is correct.  While harassing comments are not themselves actionable, they serve as evidence of a discriminatory animus, which is not itself punishable under Title VII.  *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1247 n.19 (11th Cir. 1998).  An employer

sufficiently severe or pervasive involves 'both an objective and subjective component.'" *McCann*, 526 F.3d at 1378 (citing *Miller*, 277 F.3d at 1276). "The harassing conduct must create both an objectively hostile or abusive environment-one 'that a reasonable person would find hostile and abusive'-and subjectively hostile or abusive environment-one that 'the [plaintiff] . . . subjectively perceive[s] . . . to be abusive.'" *Fleming v. Boeing Co.*, 120 F.3d 242, 245 (11th Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

### a. Subjective Component

Defendants argue Maddox did not perceive the alleged harassment to be sufficiently hostile or abusive. (Doc. 68 at 44-45). In support of this argument, Defendants point to Maddox's testimony regarding Van Vleck's "own kind" comment, admitting she didn't understand the comment because the only person on floor crew at the time was a black male. (Doc. 69-1 at 47 (184:16-17)). Defendants also contend Maddox did not perceive the November 2008 Van Vleck incident as sufficiently hostile or abusive because she did not report it to management and, when asked if she was having problems, said she had taken care of it. (*See* doc. 69-2 at 2-3 (186:4-6; 190:14-191:4) (regarding the incident) & docs. 69-2 at 3 (192:13-20) & 69-5 at 15-17) (regarding Maddox's comment). Neither of these arguments is persuasive.

There is sufficient evidence from which a reasonable juror could conclude Maddox perceived her work environment has hostile and abusive. After telling Ford, Allgood, and Stone

---

may only be held liable when this animus alters the terms and conditions of the plaintiff's employment. *Id.* This may be shown either by (1) a tangible employment action, which itself constitutes a change in the terms and conditions of employment, or (2) the existence of an "abusive working environment." *Id.* (citing *Burlington Indus. Inc. v. Ellerth*, 542 U.S. 742 (1998)). The cases Maddox cites in support of a hostile work environment claim based on a tangible employment action are distinguishable, as they involve sexual harassment actions where no disparate treatment claim is available. The court will address Maddox's claim based on a tangible employment action in Section C, entitled discrimination. This section addresses Maddox's claim based on severe and pervasive harassment and whether it altered the terms and conditions of her employment.

about issues she was having, (doc. 69-1 at 35-36 (136:19-137:14), Maddox went to Stone in June or July 2008 about the harassment. (*Id.* at 36 (139:6-20)). Thereafter, she contends, Allgood threatened her, telling her that if she complained to Stone again she'd be fired. (*Id.*at 139:20-140:8). Maddox testified she didn't complain to Stone again because the other supervisors and managers were always around. (Doc. 69-2 at 2 (187:11-18)). Maddox also testified that, on one occasion, she had the opportunity to talk to Park Grimmer, but Allgood was there and non-verbally threatened her, indicating with a horizontal hand motion across his neck that she better not complain to Park Grimmer. (*Id.* at 44 (169:10-17)). Finally, in November 2008, after the incident with Van Vleck, Maddox complained directly to the police about workplace harassment. (Doc. 69-2 at 2-3 (186:4-191:7)). Defendants' argument that Maddox did not subjectively perceive her workplace as abusive and hostile is without merit and there is sufficient evidence on this component to create a genuine issue of material fact.

### b. Objective Component

Harassing conduct is severe and pervasive when it causes the employee's workplace to become "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21. "In determining the objective element, a court looks to all the circumstances, including the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann*, 526 F.3d at 1378. "There is 'not simply some magic number of racial or ethnic insults' that preclude summary judgment, but rather 'it is repeated incidents of . . . harassment that continue despite the employee's objections [that] are indicative of a hostile work environment.' " *Mack v. ST Mobile Aerospace Eng'g, Inc.*, No. 05-14695, 2006 WL 2129661, at *7 (11th Cir. July 31, 2006) (quoting *Miller*, 277 F.3d at 1276).

Maddox presents evidence that Gore, Ford, Allgood, Van Vleck, Cobb, Rogers, and Michael (last name unknown) made harassing comments about her Native American ancestry. She does not allege this happened a handful of times, but alleges these supervisors and co-workers repeatedly made harassing comments, some of them every time he or she was around Maddox. (*See e.g.*, docs. 69-1 at 38 (147:14-148:13) (stating Van Vleck called her "a Cherokee squaw every time he got around" her) & 71-20 at 2 (stating Allgood called her a savage, squaw, and Cherokee squaw on a daily basis). Furthermore, much of the harassment went beyond name calling. Several of the harassers repeatedly asked Maddox if she lived in a teepee, (docs. 69-1 at 37-39 (143:2-144:8, 147:14-148:13-14) & doc. 71-20 at 2-3), asked if her teepee flooded when it rained, (doc. 69-1 at 41 (157:22-158:22) & doc. 71-20 at 2-3), asked her to do rain dances, (doc. 69-1 at 41 (157:22-158:22 & doc. 71-20 at 2-3), inquired about the reservation she was from, (doc. 69-1 at 37-39 (143:2-144:8, 147:14-148:13-14)), asked if she had papooses at home or how many papooses she had, (docs. 69-1 at 37-39 (143:2-144:8, 147:14-148:13-14 & doc. 71-20 at 2-3), asked her if she made her own weapons or used a bow and arrow, (docs. 69-1 at 38-39, 41, (147:14-148:13-14, (157:22-158:22) & doc. 71-20 at 2-3), asked if she chopped firewood with her tomahawk when the weather was cold, (doc. 71-20 at 2-3), asked if she scalped people, (doc. 69-1 at 38-39 (147:14-148:13-14), and asked if she wanted dead bird feathers for her hair, (doc. 71-20 at 2-3). Maddox also testified that, when she reported Michael's vulgar comments to Allgood, Allgood just laughed. (Doc. 69-1 at 44 (171:17-18)).

In addition to comments about Maddox's Native American ancestry, Van Vleck, Allgood, and others made offensive comments about mixed-race couples, knowing Maddox was in a relationship with an African-American. Van Vleck called Maddox a "nigger lover," (doc. 69-1 at 42 (162:5)), and Allgood made comments to Maddox about mixed-race couples walking

through the mall, (doc. 69-2 at 16-17 (244:17-245:4)).  Maddox overheard Allgood calling other mixed-race couples "nigger lovers" and making fun of bi-racial children, stating something like "that poor little bastard, he don't realize he's half nigger."  (Doc. 69-1 at 43 (166:9-167:5)).

The harassment culminated in November 2008, when Van Vleck called Maddox a "stupid Cherokee freak" and hit her in the back with a water jug.  (Doc. 69-2 at 2-3 (186:4-6; 190:14-191:4)).  Because management never did anything about her previous complaints, Maddox reported this incident directly to the police.  (Doc. 69-2 at 2-3 (185:14-191:7).

These allegations are hardly "sporadic and isolated" as Defendants argue.  *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008).  They occurred on a daily basis and a reasonable jury could conclude they "permeated [Maddox's work environment] with discriminatory intimidation, ridicule, and insult."  *Harris*, 510 U.S. at 21.  Although these comments were not always physically threatening, they were certainly intimidating and full of ridicule.  *See id.*at 23.  The severity of the harassment is easily demonstrated by its culmination in two threatening acts, the November 2008 Van Vleck incident and Allgood's threatening gesture to Maddox when she had the opportunity to report the harassment to Park Grimmer.  Having presented sufficient evidence of the frequency, severity, and humiliating nature of the harassment, Maddox is not required to establish how the harassment interfered with her ability to perform her job.  *Myers v. Central Fla. Invests., Inc.*, 237 Fed. App'x 452, 456-57 (11th Cir. 2007) (citing *Miller*, 277 F.3d at 1277).

As Defendants do not challenge any other aspect of Maddox's hostile work environment claim, their motion for summary judgment will be **DENIED** as to Maddox's hostile work environment claim.

### C.  Discrimination - Termination[19]

Title VII prohibits an employer from discriminating against an employee because of the employee's race, color, religion, gender, or national origin.  *See* 42 U.S.C. § 2000e-2(a).  When there is no direct evidence of discrimination, as here, a plaintiff may rely on circumstantial evidence to establish his claim, often employing the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981).  To establish a *prima facie* case for discriminatory discharge under this framework, a plaintiff must establish (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class (or was treated less favorably than a similarly-situated individual outside of her protected class).  *Reeves v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004).

Under this framework, once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its employment action, here, the decision to terminate Maddox's employment.  *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).  Once the defendant articulates a "legitimate, nondiscriminatory reason" for its action, any presumption of discrimination arising out of the *prima facie* case "simply drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993); T*ex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  At this point, the burden shifts back to the plaintiff to offer evidence and establish the employer's stated reason is a pretext for discrimination.  *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272-73.  To establish pretext, a plaintiff must show both "the reason was false, and that discrimination was the real reason" for the

---

[19] Maddox does not dispute the only adverse employment action at issue is her termination.

adverse employment action.  *Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1284 (M.D. Ala. 2011) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

### 1.  *Prima Facie* Case

Defendants contend Maddox cannot state a *prima facie* cases because she has no valid comparator.  (Doc. 68 at 30).  This argument lacks merit.  Maddox can establish the fourth element of a *prima facie* case by presenting evidence she was replaced by someone outside of her protected class.  *See Reeves*, 381 F.3d at 1235.  Defendants' reliance on an unpublished case to argue otherwise, is contrary to binding Eleventh Circuit precedent.  *See Cuddleback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004).    Maddox offers evidence Tim Sneed, a white male, performed her duties after her termination, and the next person hired was David Brown, a white male.  (Docs. 47 at 5, ¶30; 69-2 at 10-11 (219:23-221:1); & 69-9 at 23 (82:6-8)).  The burden now shifts to Defendants to articulate a legitimate, non-discriminatory reason for Maddox's discharge.

### 2.  Legitimate, Non-Discriminatory Reason and Pretext

Defendants present evidence of a legitimate, nondiscriminatory reason for Maddox's termination, specifically that two employees reported Maddox threatened to blow up the mall. (Doc. 69-19 at 2).  Although Maddox disputes threatening to blow up the mall, whether Maddox actually made this threat is immaterial.  The material issue is whether Defendants reasonably believed, based on the independent accounts of two employees in the face of Maddox's denial, that Maddox made this threat.  *See Alvarez v. Royal Atl. Develps. , Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (the proper inquiry is "the employer's beliefs, not the employee's belief and, to be blunt about it, not on reality as it exists outside of the decision maker's head").  Defendants have met this burden of production.

Maddox must now establish that Defendants' legitimate, nondiscriminatory reason for her termination was a pretext for discrimination. Maddox may do so by presenting evidence sufficient to permit a reasonable fact-finder to conclude the reason given by the employer were not the real reason for the adverse employment decision. *See Combs v. Planation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). When making this determination, the court does not act as a "super-personnel department that reexamines an entity's business decisions." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation omitted). Instead, the pretext inquiry is limited to "whether the employer gave an honest explanation for its behavior." *Id.* (citation omitted). An employer may terminate an employee for a good or bad reason, so long as the reason is not motivated by a prohibited purpose, such as discrimination based on race. *See Damon v. Fleming Supermarkets of Fla., Inc.*,

Maddox argues three main points in support of her pretext argument: (1) Van Vleck was not disciplined for striking Maddox in the back; (2) the timing of Maddox's termination, and (3) "shifting, exaggerated" testimony/evidence no one feared Maddox would blow up the mall. (Doc. 72 at 58-61). This evidence does not demonstrate Defendants' proffered reason for Maddox's termination was a pretext for discrimination.

Maddox first argues Defendants' failure to discipline Van Vleck for hitting Maddox in the back with a water jug demonstrates pretext. (Doc. 72 at 59). To establish pretext, a comparator must be "similarly situated to the plaintiff in all relevant respects," and the "misconduct must be nearly identical" to that of the plaintiff. *Rawls v. Ala. Dept. of Human Resources*, 507 Fed. App'x 895, 898 (11th Cir. 2013) (citing *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276-77 (11th Cir. 2008). Here, "'[t]he quantity and quality of [Van Vleck's] misconduct' is not 'nearly identical'" to Maddox's alleged conduct. *Turner v. Fla. Prepaid*

33

*College Bd.*, 522 Fed. App'x 829, 832 (11th Cir. 2013) (quoting *Stone & Webster Constr., Inc. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012)).  Two employees reported that Maddox, upset about not receiving her W-2, threatened to blow up the mall.  Based on those reports, Defendants conducted an investigation, independently confirming the threat with each employee who reported it.  Based on the results of this investigation and the serious nature of the threat to the safety of mall patrons and employees, Stone terminated Maddox's employment, after Allgood's input and Park Grimmer's approval.

Unquestionably, a threat to blow up a mall is different in quality and quantity than the act of striking a fellow employee.  Because these transgressions are not "nearly identical," and the court is not permitted to second-guess the judgment of the employer, Van Vleck is not a proper comparator.  However, even looking at the two situations more closely, Defendants investigated both complaints, and when Maddox did not present or confirm the Van Vleck incident to her employer, the investigation stalled.

Specifically, as she did when she was informed of Maddox's alleged threats, upon learning of the November 2008 incident between Van Vleck and Maddox, Stone initiated an investigation.  Allgood met with Maddox and asked her how she was doing and if anyone had been bothering her.  (Doc. 69-5 at 17).  Maddox initially replied "no," but upon further questioning, she said she took care of it herself.  (Doc. 69-2 at 4 (195:22-23)).  Allgood told Maddox to come see him if she had any problems, and she said she would.  (*Id.* (194:14-195:8) & doc. 69-5 at 15-17).  Unlike the situation involving Maddox's threats, there was no independent confirmation of the incident.

Maddox's arguments regarding the timing[20] of the alleged threats and her termination as

---

[20] Allgood's inability to specifically remember the facts surrounding Maddox's

well as her arguments based on "shifting, exaggerated testimony" are not evidence of pretext. (*See* doc. 72 at 59-62).   There is no dispute that two employees reported Maddox made a threat to blow up the mall on Saturday, January 17, worked on January 18, and was off work the following four days (January 19-22).   (Docs. 69-9 at 21 (76:4-10) & 69-20 at 2).   There is also no dispute Stone learned of the alleged threat on January 20, when Maddox was not at work, and Stone met with Maddox when she returned to work on January 23.   (Doc. 69-5 at 18 & 69-14 at 59).   This timeline does not demonstrate Defendants failed to take the alleged threats seriously. At most, Maddox is second-guessing Stone's decision to wait to meet with her in person when she returned to work on January 23 and Allgood's decision to tell Stone about the alleged threat when they both returned to work on January 20.   Furthermore, Maddox does not dispute the fact two witnesses (against whom she makes no allegations) independently confirmed she made serious threats against the mall.   Defendants have consistently maintained Maddox was terminated because of her threat to blow up the mall and has never "shifted" its reason.

Based on these arguments, Maddox "fail[s] to point to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' sufficient to rebut the legitimate reason[] given by [Defendants] for her termination."   *See Sampath v. Immucor, Inc.*, 271 Fed. App'x 955, 962 (11th Cir. 2008) (citations omitted).   Accordingly, Defendants' motion for summary judgment is due to be granted on this claim, unless Maddox demonstrates a triable issue of fact by presenting a "convincing mosaic of circumstantial evidence."   *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2001).

### 3.   Convincing Mosaic of Circumstantial Evidence

termination is insufficient to establish pretext.   *See e.g., EEOC v. Dart Container Corp.*, No. 08-55352012 WL 1969062, at * 16 (E.D. Pa. June 1, 2012) ("plaintiffs' attempt to cast doubt on [an alleged decisionmaker's] memory is inadequate to show pretext" where other decisionmakers "did in fact recall the decision at his deposition" and testified to the reasons for the same).

The *McDonnell–Douglas* framework is not the exclusive means of creating a triable issue of fact in an employment-discrimination case.  *Lockheed-Martin Corp.*, 644 F.3d at 1328.  A plaintiff may do so by presenting a "convincing mosaic of circumstantial evidence" and various forms of evidence sufficient to allow a reasonable inference that the employer fired the employee based on impermissible discrimination.  *Id.*

In support of this argument, Maddox points to Allgood's numerous racial comments and slurs as evidence of his discriminatory animus.[21]  (Doc. 72 at 56).  Although Allgood made various racial comments and slurs, which can be construed as evidence of a discriminatory animus, there is no evidence linking this general bias to Maddox's termination.  *See e.g.,*, *Richie v. Indus. Steel, Inc.*, 426 Fed. App'x 867, 874 (11th Cir. 2011).  Specifically, there is no evidence

---

[21] Although Maddox frames her brief to include Allgood's comments only as part of her "convincing mosaic" argument, such evidence is also properly considered as evidence of pretext to overcome an employer's proffered legitimate, nondiscriminatory reason. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1362 (11th Cir.1999) (holding that supervisor's statement that he wanted "aggressive, young men" like himself to be promoted was "highly suggestive circumstantial evidence" of age discrimination).  However, even viewing these comments as indicative of Allgood's discriminatory animus, they do not demonstrate Defendants' proffered legitimate, nondiscriminatory reason for terminating Maddox was a pretext for unlawful discrimination.  Allgood's only involvement in the decision to terminate Maddox included relaying the threats reported to him to Stone, meeting with the two employees with Stone when she asked them to write down what happened, and was present when Maddox terminated Stone.  There is no evidence this discriminatory animus infiltrated the decision making process in any way.

Furthermore, Allgood's role in the decision to terminate Maddox was limited, and Maddox's "cat's paw" argument is unpersuasive.  (Doc. 72 at 57 n.25).  This theory applies "if a supervisor performs an act motived by [a discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is the proximate cause of the ultimate employment action, then the employer is liable."  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011).  Here, although Allgood told Stone about the two reports he received regarding Maddox threatening to blow up the mall, Stone made the recommendation to terminate Maddox and Park Grimmer approved it.  (Doc. 72 at ¶ 91).  Stone made this decision after an investigation, and there is no proximate cause since Allgood is not the person who claimed Maddox threatened to blow up the mall but merely relayed what two other employees reported.  There is no argument Allgood wouldn't have relayed a report of such threats if made by another employee.

Allgood thought Maddox could not do her job because of her race or association, and these comments do not create a genuine issue of material fact as to whether race or association was the real reason for Maddox's termination.

The cases Maddox cites in support of this argument, *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998) and *EEOC v. Alton Packaing Corp.*, 901 F.2d 920 (11th Cir. 1990), (doc. 72 at 57-58), are distinguishable and do not dictate a different result.  In examining *Ross*, the Eleventh Circuit explained:

> In *Ross* . . . we determined that potentially discriminatory comments that were not directly related to the employment decision could contribute to a circumstantial showing of discriminatory intent.   The facts of *Ross*, however, are clearly distinguishable.  In *Ross*, fairly strong additional evidence supported a finding of pretext (specifically, that the supervisor who had fired plaintiff had been engaged in the same activity for which plaintiff was fired).   But not such additional evidence exists here.  The *Ross* court, in fact, explicitly noted that the evidence relating to the discriminatory comments had to be "read in conjunction with the entire record" and "considered together with" the other evidence in the case.

*Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002).  Here, there is nothing to link Allgood's comments to Maddox's termination and no "additional evidence" to support a finding of pretext.  Furthermore, *Atlon* involved direct (not circumstantial) evidence of discrimination and is therefore clearly distinguishable.  901 F.3d at 923-24.   Maddox does not present a triable issue of fact, and summary judgment will be **GRANTED** as to Maddox's race and association discrimination claim related to her termination.

### D.  Retaliation

To establish a retaliation claim, Maddox must prove (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse employment action, and (3) there was some casual relation between the two events.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

There is no dispute Maddox engaged in a protected activity when she filed an EEOC charge on December 18, 2008, or that she suffered an adverse employment action when she was terminated on January 23, 2009.  (Doc. 68 at 33-37).  Instead, the parties' arguments focus on the causal connection element.   To establish a causal connection, a plaintiff must show: (1) the decisionmaker(s) was aware of his protected conduct and (2) the protected activity and the adverse employment action were not wholly unrelated.  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  If the decisionmaker was aware of the protected conduct, close temporal proximity between the protected activity and the adverse action may be sufficient to show the requisite causal connection.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  If there is a delay of more than three months between the two events, the temporal proximity is not close enough, and the plaintiff must offer some other evidence tending to show causation.  *Id.*  However, intervening acts of misconduct can diminish any inference of causation that arises from temporal proximity.  *Henderson v. FedEx Express*, 422 Fed. App'x 502, 506 (11th Cir. 2011) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)).

Here, although only one month separates the Maddox's filing of an EEOC Charge and her termination, there is also an intervening act of misconduct – her threats to blow up the mall.  Maddox's threats diminish the inference of causation that arose from the temporal proximity between her EEOC Charge and termination.  *See Henderson*, 422 Fed. App'x at 506.

Even if Maddox were to establish causation and a *prima facie* case of retaliatory discharge, Defendants have articulated a legitimate, non-retaliatory reason for her discharge, that two employees reported Maddox threatened to blow up the mall.  *See Pennington v. City of*

*Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  The burden would then shift back to Maddox, who would be required to offer evidence this proffered reason is a pretext for unlawful retaliation.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).  Maddox's opposition to summary judgment on this claim relies heavily on statements Allgood made to Scott in late 2008 that Scott reported in his EEOC Charge.  (Doc. 72 at 66). Viewing this evidence in Maddox's favor, these statements show that Allgood wanted to get rid of anyone who was a threat to his livelihood, Grimmer Realty.  (*See* doc. 69-10 at 18).  However, reliance on these statements to establish pretext requires a jury to ignore Allgood's limited role in the decision to terminate Maddox.  A juror would have to believe that someone in Allgood's position would not have relayed the threat Longwell and Doss reported or would in some way dissuaded Stone from terminating Maddox's employment.  The undisputed evidence surrounding Maddox's termination does not support those assumptions.  To the contrary, Defendants offer evidence that other employees, who had not complained of discrimination or filed an EEOC Charge, had been fired for similar or less severe offenses.  This includes Patterson who was terminated for threatening to kill her supervisor.  Mall security was instructed not to allow her to return.  Two other employees, Bohl and O'Hara, were terminated in 2008 and 2009 respectively, for physical altercations with another employee.  (Doc. 69-17 at 20).

In determining whether summary judgment on Maddox's retaliation claim is proper, the ultimate question is whether she has presented evidence allowing a reasonable jury to conclude that she would not have been terminated if she had not filed her EEOC Charge.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, -- U.S. -- , 133 S. Ct. 2517 (2013).   She has not.

## IV. Conclusion

Defendants' motion for summary judgment, (doc. 68), will be **GRANTED IN PART**

**AND DENIED IN PART**.   The motion will be **GRANTED** as to Maddox's gender discrimination claim, race and association discrimination claim, and retaliation claim.   The motion will be **DENIED** as to Maddox's hostile work environment claim.   All claims against Grimmer Realty will be **DISMISSED**.   A separate order will be entered.

DONE this 10th day of November 2015.


_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE